1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DONALD L. CAVINESS,

11              Petitioner,                    No. CIV S-04-2629 MCE JFM P

12        vs.

13   D.L. RUNNELS, Warden,

14              Respondent.             FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding in propria persona with an application for

17   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction

18   on charges of six counts of second-degree robbery, and two prior serious felony convictions, and

19   the sentence of 160 years to life in prison imposed thereon on April 30, 2001.  Petitioner raises

20   three claims in his petition, filed December 13, 2004, that his prison sentence violates the

21   Constitution.

22                                 PROCEDURAL HISTORY

23            Petitioner's conviction was affirmed by the California Court of Appeal, Third

24   Appellate District, on March 19, 2002.  Petitioner's sole claim of error on direct appeal was that

25   /////

26   /////

                                            1

1  petitioner was prejudiced by the court's instruction pursuant to CALJIC No. 17.41.1.[1]  (March

2  18, 2005 Lodged Item 1.)

3        Petitioner timely petitioned the California Supreme Court for Review, which was

4  denied on June 12, 2002.  (March 18, 2005 Lodged Item 2.)

5        On October 11, 2000, petitioner filed a petition for writ of habeas corpus in the

6  San Joaquin County Superior Court.  (Pet., Ex. 8.)  Petitioner raised two grounds:  improper

7  denial of his Faretta motion and juror bias.  (Id.)  On November 7, 2002, the petition was denied

8  on the merits.

9        On December 12, 2002, petitioner filed a petition for writ of habeas corpus in the

10  Sacramento County Superior Court requesting that the court provide certain transcripts.

11  (Answer, at 2.)  On April 23, 2003, the Superior Court granted plaintiff's request for transcripts.

12  (March 18, 2005 Lodged Item 3.)  Thereafter, on June 20, 2003, the California Court of Appeal,

13  Third Appellate District, dismissed the petition as moot.  (March 18, 2005 Lodged Item 4.)

14        On May 27, 2003, petitioner filed a petition for writ of habeas corpus in the

15  California Court of Appeal, Third Appellate District, which was denied on January 9, 2004,

16  without comment.  (Pet., Ex. 10.)

17        On February 2, 2004, petitioner filed a petition for writ of habeas corpus in the

18  California Supreme Court, which was denied on December 12, 2004, with a citation to In re

19  Clark (1993) 5 Cal.4th 750.  (Pet., Ex. 11.)

20  /////

---

22      [1]  Petitioner provided a copy of a notice of appeal dated April 30, 2001 and signed by
petitioner, in propria persona, alleging insufficient evidence, juror bias and "any other grounds
23  which become apparent to Appellate Counsel upon review of the record."  (Pet., Ex. 7.)
Petitioner contends his trial lawyer filed an appeal on April 30, 2001, raising the grounds listed in
24  Ex. 7.  (Pet. at 27.)  There is no notice of appeal signed by Ms. Lua appended to petitioner's
petition.  However, the notice of appeal signed by petitioner on April 30, 2001, is devoid of any
25  file-stamp or docket mark reflecting its filing with a court.  (Pet., Ex. 7.)  In addition, petitioner
was represented by counsel on appeal (Pet., Ex. 3); the counseled appeal and the Third District
26  Court of Appeal opinion only addressed the jury instruction claim.  Indeed, in the instant petition,
petitioner faults appellate counsel for failing to appeal, inter alia, the issue of juror bias.

1  On March 10, 2004, petitioner filed a petition for writ of habeas corpus in the

2  California Court of Appeal, Third Appellate District, which was denied the next day.  (Answer,

3  at 2.)

4  ANALYSIS

5  I.  Standards for a Writ of Habeas Corpus

6  Federal habeas corpus relief is not available for any claim decided on the merits in

7  state court proceedings unless the state court's adjudication of the claim:

8  (1) resulted in a decision that was contrary to, or involved an
   unreasonable application of, clearly established Federal law, as
9  determined by the Supreme Court of the United States; or

10  (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
11  State court proceeding.

12  28 U.S.C. § 2254(d).

13  Under section 2254(d)(1), a state court decision is "contrary to" clearly

14  established United States Supreme Court precedents if it applies a rule that contradicts the

15  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

16  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

17  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

18  (2000)).

19  Under the  "unreasonable application" clause of section 2254(d)(1), a federal

20  habeas court may grant the writ if the state court identifies the correct governing legal principle

21  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

22  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

23  simply because that court concludes in its independent judgment that the relevant state-court

24  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

25  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

26  /////

3

1    123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

2    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

3             The court looks to the last reasoned state court decision as the basis for the state

4    court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

5    II.  Procedural Default

6             Respondent contends that all three of petitioner's claims are procedurally

7    defaulted based on the California Supreme Court's citation to In re Clark.  Although the question

8    of procedural default and other general prerequisites for federal habeas corpus which are

9    unrelated to the merits of the particular claims "should ordinarily be considered first," a

10   reviewing court need not do so "invariably," especially when those issues turn on difficult

11   questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (court bypassed

12   question of procedural default to reach the merits of petitioner's claims).  See also Busby v.

13   Dretke, 359 F.3d 708, 720 (5th Cir. 2004) (same); Carr v. Cigna Securities, Inc., 95 F.3d 544,

14   547 (7th Cir. 1996) (court choosing to bypass statute of limitations issues to reach the merits of

15   the claims before it).  In order to resolve whether the instant petition is procedurally-defaulted,

16   the court would be required to address complicated and novel issues with regard to the

17   California's timeliness rules.  In this case, the court finds that petitioner's claims can be resolved

18   more easily by addressing them on the merits.  Accordingly, without deciding the issue, the court

19   will assume for the sake of these findings and recommendations that petitioner's claims are not

20   procedurally defaulted.

21   II.  Petitioner's Claims

22        A.  Juror Bias

23             Petitioner's first claim is that his trial was tainted by juror bias.  Petitioner

24   contends that Juror #11 was dishonest at voir dire because he stated he knew none of the

25   witnesses, had not heard about the case before trial, and had no relationship to the victim.  (Pet.,

26   at 10.)  Later it was discovered that Juror #11 worked for a company that owned the Exxon

4

station that petitioner allegedly robbed and knew at least one of the witnesses who testified at trial.  (Id.)  Petitioner argues Juror #11's untruthful answers hid this juror's bias from the court. (Id. at 10-11, 13.)  Petitioner contends his conviction should be reversed based on this structural error.

        The last reasoned rejection of this claim is the decision of the San Joaquin County Superior Court on a petition for writ of habeas corpus.  (Pet., Ex. 8.)  The state court rejected this claim as follows:

> During the course of Petitioner's criminal trial, Juror #11 informed the trial court that he worked for Vanco Truck and Auto Plaza, a company owned by Exxon.  Exxon was one of the victims of Petitioner's criminal conduct which was being tried.  Juror #11 further advised the trial court that the names of two of the Exxon witnesses sounded familiar.

> The record reflects that Juror #11 promptly brought the relationships to the trial court's attention.  The trial court questioned Juror #11 about the relationship between Exxon and his employer and the relationship between the Exxon employees and him.  The trial court asked Juror #11 if the relationship would affect his ability to be fair.  Juror #11 said no.  The court then allowed Juror #11 to remain impaneled.  After the testimony of the Exxon witnesses, the trial court again questioned Juror #11 about his employer's relationship with Exxon and his relationship with the witnesses.  The trial court determined that the relationships were tenuous and did not constitute a conflict.

> As recognized by our Supreme Court in In re Carpenter (1993) 9 C.4th 634, 650, "A judgment adverse to a defendant in [a] criminal case must be reversed or vacated when the court finds substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matters relating [to] the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury . . . .  In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely that it has influenced the juror."

> "What is clear is that an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incompetent answer hid the juror's actual bias."  McDonough Power Equipment, Inc. v. Greenwood (1984) 464 U.S. 548, 556-557.

/////

1                Again, Petitioner has failed to establish a prima facie case for
habeas corpus relief.  In re Bower (1985) 38 C.3d 865, 872.

2

3 (In the Matter of the Petition of Donald Caviness, SF079779B at 2-3 (November 7, 2002).

4                The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

5 fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).

6 See also Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Green v. White, 232 F.3d 671, 676 (9th Cir.

7 2000).  "Due process means a jury capable and willing to decide the case solely on the evidence

8 before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the

9 effect of such occurrences when they happen."  Smith v. Phillips, 455 U.S. 209, 216 (1982); see

10 also McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) ("One

11 touchstone of a fair trial is an impartial trier of fact[.]");[2] Fields v. Brown, 431 F.3d 1186, 1192

12 (9th Cir.2005).  A prospective juror must be removed for cause if his views would prevent or

13 substantially impair the performance of his duties as a juror.  See Wainwright v. Witt, 469 U.S.

14 412, 424 (1985).  Jurors are objectionable if they have formed such deep and strong impressions

15 that they will not listen to testimony with an open mind.  Irvin, 366 U.S. at 722 n.3.  "Even if

16 only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to

17 an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523-34 (9th Cir.1990) (internal quotations

18 omitted); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc).

19                To obtain a new trial on account of a juror's failure to disclose information during

20 voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question

21 on voir dire, and then further show that a correct response would have provided a valid basis for

22 a challenge for cause."  McDonough, 464 U.S. at 556.  As the court explained in Dyer, it follows

23 from McDonough that "an honest yet mistaken answer to a voir dire question rarely amounts to a

24 constitutional violation; even an intentionally dishonest answer is not fatal, so long as the

25

26      [2]  Although McDonough was a civil case, the same standard is used in criminal cases.
Tinsley v. Borg, 895 F.2d 520, 524 (9th Cir. 1990).

1  falsehood does not bespeak a lack of impartiality." Dyer, 151 F.3d at 973 (citing McDonough,

2  464 U.S. at 555-56).

3        Courts analyze juror bias under two theories:  actual and implied bias.  The

4  determination whether a juror was actually biased is a pure question of fact.  See Dyer v.

5  Calderon, 122 F.3d 720, 728 (9th Cir.1997).[3]  Because of the importance of such qualities as

6  demeanor and inflection in determining credibility, the "findings of state trial and appellate

7  courts on juror impartiality deserve 'a high measure of deference." '  Tinsley, 895 F.2d at 525

8  (quoting Rushen v. Spain, 464 U.S. 114, 120 (1982) (per curiam)).

9        Because the bias of a juror will rarely be admitted by the juror
   himself, "partly because the juror may have an interest in
10  concealing his own bias and partly because the juror may be
   unaware of it," [Smith,] at 221-222, 102 S.Ct., at 948-949, it
11  necessarily must be inferred from surrounding facts and
   circumstances.  Therefore, for a court to determine properly
12  whether bias exists, it must consider at least two questions:  are
   there any facts in the case suggesting that bias should be
13  conclusively presumed; and, if not, is it more probable than not
   that the juror was actually biased against the litigant.  Whether the
14  juror answered a particular question on voir dire honestly or
   dishonestly, or whether an inaccurate answer was inadvertent or
15  intentional, are simply factors to be considered in this latter
   determination of actual bias. . . .  One easily can imagine cases in
16  which a prospective juror provides what he subjectively believes to
   be an honest answer, yet that same answer is objectively incorrect
17  and therefore suggests that the individual would be a biased juror
   in the particular case.

18

19  McDonough, 464 U.S. at 558 (Brennan, J. concurring).

20        Even if a juror's responses on voir dire do not indicate actual bias, bias can be

21  implied from the " 'potential for substantial emotional involvement, adversely affecting

22  impartiality' inherent in certain relationships."  Tinsley, 895 F.2d at 527 (quoting United States v.

23  Allsup, 566 F.2d 68, 71 (9th Cir.1977)).  However, bias should be presumed "[o]nly in 'extreme'

24  or 'extraordinary' cases," id. (quoting Smith, 455 U.S. at 222-23 n.* (1982) (O'Connor, J.,

25  _____

26     [3]  The Dyer court noted that because juror had relatives who had been convicted of
   crimes, she might be sympathetic to the accused as well as to the victim.  Id. at 979.

7

concurring)). "Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." Smith, 455 U.S. at 222.[4] The Court considers de novo whether bias should be implied from the facts established by the trial court. See Smith, 455 U.S. at 222-23 n.* (1982) (O'Connor, J., concurring).[5] However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation" (id. at 217) and federal courts on habeas review should not disturb the state courts' findings unless the habeas court sets forth a basis for disarming such findings of the statutory presumption that they are correct and may be overcome only by convincing evidence." Id. at 219.

Finally, "[c]learly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised." Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003), cert. denied, Tracey v. Belleque, 125 S.Ct. 196 (2004).

/////

---

[4] The Ninth Circuit has implied bias where (1) a juror has prejudicial information about the defendant; (2) a juror has a personal connection to the defendant, victim, or witnesses; or (3) a juror or a close relative of the juror has been involved in a situation involving similar facts. Coughlin v. Tailhook Ass'n, 112 F.3d 1052, 1062 (9th Cir.1997); see also Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.1998) (en banc ) (implying bias from juror's pattern of lying about similar crime perpetrated against her relative). Extreme instances of juror deception may also result in a finding of implied bias. Green v. White, 232 F.3d 671, 677-78 (9th Cir.2000) (implying bias from juror's excessive, deliberate lies). Conversely, courts have refused to imply bias when a juror was personally acquainted with a witness, see Tinsley, 895 F.2d at 528-29 (collecting cases), or when the employment of a juror is closely related to the substance of the trial. See id. at 529 (no implied bias in rape prosecution when social worker juror had counseled rape victim for eighteen months and testified on her behalf).

[5] The Smith court addressed allegations that during the murder trial a juror submitted an application for employment as an investigator to the District Attorney's office and that the prosecution, informed of the juror's application, withheld the information from the trial court and defense counsel until after the trial. Id. at 209.  The court held that a state trial court's post-trial hearing on an allegation of juror bias was sufficient to comply with the requirements of due process. Id. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.")

1          i.  The Instant Record

2          During voir dire, the jury pool was informed that plaintiff was charged with the

3    robbery of several businesses, including Hostess Bakery, Baskin Robbins, Union 76, Exxon, and

4    Orowheat Bakery.  (Pet., Ex. 2 at 16-17.)  The prospective jurors were advised they would be

5    asked certain questions, which were listed on a board,  including whether they knew any of the

6    witnesses in the case.  (Id. at 52-53.)  The names of 61 potential witnesses were then read.  (Id.,

7    at 53-54.)  The names of witnesses Jose Rosales[6] and Rod Peterson were read, but were not

8    further identified by their employer or work station.  (Id. 54.)  Juror #11 reported his occupation

9    as maintenance supervisor.[7]  (Id. 70.)  Juror #11 stated that he supervised four people and was

10   required to "keep all the fuel pumps running and change cables and [hoses] and all at the truck

11   stop."  (Id. at 108.)

12         Juror No. 11 answered the questions on the board and denied knowing any of the

13   witnesses listed, hearing about the case prior to the trial, and having a  relationship to the victims.

14   (Id. at 70.)

15         On February 22, 2001, the prosecution was making its opening argument and

16   noted that on June 27, petitioner "goes into the Exxon Station at about 2:00 a.m. in the morning.

17   This Exxon Station is located in French Camp.  And he comes up to the counter and he said to

18   Mr. Rod Peterson, "Give me the fucking money, man.  I'm not joking."  (Reporter's Transcript

19   on Appeal "RT" 60.)  "There were two clerks working at the Exxon Station and they got a good

20   look at the car [petitioner] left in."  (RT 61.)

21         During the testimony of third witness John Reyes (Clerk's Transcript ("CT")

22   223), on February 22, 2001, the trial court was presented with a note from Juror #11.  (RT 111.)

23

24         [6]  Although the name "Jose Rosales" was read, the actual name of the witness who
worked at Exxon with Rod Peterson was "Jesus Rodriguez."  (RT 174.)  Mr. Rodriguez denied
going by the name Jose Rosales.  (Id.)

25

26         [7]  Juror #11 also reported he previously served as a juror on a criminal case where there
was no verdict because it was a hung jury.  (RT 70; 108.)

1   Juror #11 reported that the company he worked for, Vanco Truck and Auto Plaza, owned the gas

2   station petitioner was charged with robbing.  (RT 111.)  Juror #11 stated that Vanco owns four

3   different Exxon stations and "a bunch of car lots."  (Id.)  When the trial judge asked him whether

4   he had heard about this before, Juror #11 responded:

5           I was told that it was robbed, but I didn't pay that much attention to
            it until I was eating my lunch today and I started thinking. . . .And I
6           thought, well, I feel like I should disqualify myself as a juror.

7   (RT 112.)  The trial court inquired whether Juror #11 had any financial stake in Vanco, other

8   than his employment, and Juror #11 replied no.  (RT 112.)  Juror #11 denied he ever worked at

9   the Exxon gas station, but noted he knew the manager and assistant manager.  (RT 112.)  At

10  Juror #11's request, the court repeated the Exxon witnesses' names, Jose Rodriguez Rosales and

11  Rod Peterson, and asked Juror #11 if he knew them.  (RT 112.)  Juror #11 stated "[t]he names

12  sound familiar.  I might have talked to them at the store itself.  Yeah, it's a gas station."  (RT

13  112-13.)

14          THE COURT:  But it's more of an acquaintance type thing?

15          JN. 11:  More acquaintance-type thing when I had to do something or whatever.

16          THE COURT:  Did she ever discuss the incident with you?

17          JN. 11:  No, sir.

18  (RT 113.)  At this point, defense counsel objected to Juror #11 remaining on the jury.  (RT 113.)

19  Counsel argued that Juror #11 worked for the company, had met the victims, and that his contact

20  with the individuals and his working at the gas station would go toward their credibility.  (RT

21  113.)  Counsel argued that Juror #11 had a financial interest here because he gets paid by the

22  same company.  (RT 113.)

23          The trial court responded:

24          I don't think that he has a general interest because he didn't
            indicate that he necessarily knew the witnesses.  We'll wait until
25          the witnesses testify and then I'll ask him if he recognizes them.
            So we'll take that issue up at that time.  But if he doesn't recognize
26          them, I don't see any reason why he couldn't still be a fair juror.  I

                                        10

1       think he was just in an abundance of caution advising The Court of
this connection that his business has.  And it certainly doesn't seem

2       like it's a close relationship that the business has, certainly not –
the juror doesn't have any relationship to the gas station, other than

3       it's just an asset that happens to belong to his company, but we'll
take it up again after the witnesses testify.

4

5 (RT 114.)

6       After Rod Peterson and Jesus Rodriguez and other witnesses testified on February

7 22, 2001, the court dismissed the jury, with the exception of Juror #11.  (RT 212.)  The following

8 colloquy took place:

9       THE COURT:  We did have testimony this afternoon from two
witnesses who worked at the Exxon Station.  Did you recognize

10       either of those witnesses?

11       JN. 11:  The – I recognized the first – I think his name was Ray –
hold on.  Let me get back to my notes here – Rod, Rod Peterson,

12       excuse me.

13       THE COURT:  Okay.

14       JN. 11:  I recognized him.  I've talked to him maybe for two
minutes one time when I was down there repairing something.

15       Because like I said, I do maintenance, so I also do maintenance at
them stores.

16

17       THE COURT:  Did you recognize the other one?

      JN. 11:  I've seen him, but I don't ever talk to him.

18

19       THE COURT:  So as far as Mr. Peterson, you say you talked to
him two or three minutes one time?

20       JN. 11:  Yeah.  He went out to smoke a cigarette and we were just
shooting the bull.

21

22       THE COURT:  Now, you have seen those witnesses and you've
seen other witnesses.  Do you think you'd be able to evaluate the

23       testimony of those two witnesses at the Exxon Station the same as
all the other witnesses?

24       JN. 11:  Yes, sir.

25       THE COURT:  Would it have any effect on your ability to be fair
and impartial to both sides in this case?

26

JN. 11:  No.

THE COURT:  Would you be able to set aside the fact that the company you work for happens to have an ownership interest in that service station there?

JN. 11:  Yes, sir.

THE COURT:  Okay.  Ms. Lua, would you like to ask any questions?

MS. LUA:  You said that you've smoked with Mr. Peterson.

JN. 11:  Well, we were outside smoking a cigarette because you can't smoke in the building.  So if you have to smoke a cigarette, you have to go outside.

THE COURT:  During that time were you having a conversation with him?

JN. 11:  I went down there one morning, I think it was 5:00 o'clock in the morning, to put up a splash guard on a sink because he was working the graveyard shift.  That was before anything else, you know.

THE COURT:  So did you – was he the person that you contacted before you went ahead and fixed what you had fixed?

JN. 11:  No.  I just went in and told him who I was, that I worked at the truck stop, and I was to put that splash guard up.  It was a metal silver splash guard, aluminum splash guard, in the sink for the owner of Tulley's.

MS. LUA:  Was that the extent of your conversation?

JN. 11:  Yeah.

MS. LUA:  And that was about two minutes, you said?

JN. 11:  About two, three minutes.

MS. LUA:  And the other gentleman, you said?

JN. 11:  I've seen him, but I've never talked to him.

MS. LUA:  You said that the company that you work for owns the gas station; is that right?

JN. 11:  Yes, ma'am.

MS. LUA:  As part of that ownership, do you get involved in any of the transactions?

1    JN. 11:  No.  The only thing I do, I work at Vanco at the truck stop,
     and they own that Exxon.  And they own a couple of them in
2    Manteca – yeah, Manteca – one on Lathrop Road and one on
     Yosemite Avenue.  And I do – if something goes wrong, like they
3    need tile fixed or doors fixed or something fixed, they call me and I
     go fix it.

4
     MS. LUA:  And that's pretty much your extent of contact with the
5    Exxon?

6    JN. 11:  Right.  It's just maintenance.  That's all.

7    MS. LUA:  I have no further questions.

8    THE COURT:  When was that conversation you had with Mr.
     Peterson?  How long ago?
9
     JN. 11:  It was – I can't remember, Your Honor.  It's been quite
10   awhile ago.

11   THE COURT:  Six months?  A year?  Two years?

12   JN. 11:  Probably a year, last year.

13   THE COURT:  Fine.  Thank you.

14   (RT 213-16.)  Juror #11 was excused until the next day with the proper admonitions.  (RT 216.)

15          The court then went back on the record with just the attorneys and petitioner

16   present.  (RT 216.)

17          MS. LUA:  I would just renew my objection.  I think that's still
            improper since he has had some contact with the witness.  He does
18          – he's employed by the same people who own the store, so there is
            a – some financial interest.  I mean, it is the people who pay him.
19          It is those same people who would have suffered the loss in this
            case because they are owners of it.  So the loss to the Exxon is a
20          loss to the company for which he works, so I still feel that it's
            inappropriate to keep him as a juror on the case.
21
            THE COURT:  I think as far as the ownership interest, so far as his
22          company owning the Exxon Station, he is not part of management
            and he himself doesn't have a financial interest in the business.
23          He's an employee.  I think that any financial impact upon him and
            upon the business would be minimal.
24
            As far as knowing the witnesses, he said that he had a conversation
25          with Rod Peterson about a year ago for two or three minutes, and
            he also said that he would be able to evaluate the testimony of the
26          witnesses involving the Exxon station the same as all the other

                                    13

1  witnesses in the case.  So I'm satisfied that he's going to be able to
2  be fair and impartial to both sides in this case in spite of that
   tenuous relationship between the juror and the Exxon Station in
3  French Camp.  So I don't find that there's a conflict.  I do find that
   he's going to be able to follow the oath that a juror has, and I think
   he is going to be able to be fair to both sides.  So I am going to
4  leave [Juror #11] on the jury.

5  (RT 216-18.)

6          ii.  Application

7          Petitioner has failed to demonstrate that Juror #11 lied during voir dire.  The

8  record reflects that during voir dire, reference to Exxon was made generically, without

9  identifying the specific Exxon Station at issue here.  (Pet., Ex. 2 at 17.)  One of the witnesses,

10 Jesus Rodriguez, was called by the name Jose Rosales.  (Pet., Ex. 2 at 54.)  The names of the

11 witnesses at issue here were numbers 50 and 51 of 61 names read into the record.  (Id.)  And,

12 unlike the law enforcement witnesses, these witnesses were not further identified by their

13 employer or work station.  (Id. 54.)  Petitioner argues that because Vanco owned more than one

14 Exxon Station and Juror #11 stated he had worked at all of those Exxon Stations, this

15 demonstrates Juror #11 lied.  (Traverse at 15.)  However, petitioner has provided no evidence

16 that Vanco owned all of the Exxon Stations in the surrounding area such that it would put Juror

17 #11 on notice that it was one of Vanco's stations that had been robbed.  All of this information,

18 without more, was not enough to demonstrate Juror #11 was dishonest when he claimed he did

19 not know any of the witnesses, had not heard about the case prior to the trial, and had no

20 relationship to the victims.

21         Moreover, the honesty of Juror No. 11's responses is further bolstered by the fact

22 that once Juror # 11 became aware of a possible connection, he immediately wrote a note to the

23 court, voluntarily informing the court that he should possibly be disqualified as a juror.  (RT 112-

24 13.)[8]  If Juror #11 had intended to conceal the fact that Vanco owned the Exxon Station that had

25
26         [8]  The trial court earlier commended Juror No. 11 for his candor in admitting that despite
   the fact he wouldn't be paid during jury duty, it would not pose a financial hardship.  (Pet., Ex. 2,

14

1  been robbed, he would not have written the note to the trial judge.

2          The record also supports the inference that it was further testimony in the case that

3  triggered Juror #11's memory of the connection to the instant case.  On February 22, 2001, during

4  opening argument, counsel specifically identified which Exxon station had been robbed.  (RT

5  60.)  That same day, during the testimony of third witness John Reyes (CT 223), Juror #11

6  notified the court of the employment connection.  (RT 111.)  Juror #11 testified the employment

7  connection occurred to him while he was thinking at lunch.  (Pet., Ex. 2, at 112.)

8          Finally, the information that the trial judge elicited from Juror #11 once the

9  additional facts came to light supports the finding that Juror #11 was unaware of the connection

10 during voir dire.  Initially, only one of the witnesses' names "sounded familiar."  (RT 113.)  It

11 wasn't until that witness testified that Juror #11 recalled having one brief conversation with him

12 about one year ago.  (RT 116.)  And even then, Juror #11 had to refer back to his notes to get the

13 name of the witness right.  (RT 214.)  The other witness he had seen, but not talked to.  Such

14 brief acquaintances are insufficient to demonstrate that Juror #11 lied during voir dire.  Petitioner

15 has presented no additional evidence to support this claim.  Juror #11's responses at voir dire

16 were honest, yet mistaken answers, which do not rise to the level of constitutional violation.

17 McDonough, 464 U.S. at 555-56

18          In light of the above, this court finds petitioner has failed to demonstrate that Juror

19 #11 failed to answer honestly a material question on voir dire.  Thus, petitioner is not entitled to a

20 new trial.

21          Moreover, even if Juror #11 had answered the questions during voir dire, the

22 answers later elicited by the trial judge demonstrate no valid basis for challenge for cause.  Juror

23 #11 was not directly employed by the Exxon Station at issue here.  Rather, he worked for a larger

24 company that owned the Exxon Station and numerous other stations.  This represented an

25 _____

26 at 21.)

1    attenuated, nominal financial connection.  The facts that Juror #11 recognized two of the

2    witnesses at trial, and had only a brief conversation with one about a year ago, were insufficient

3    to demonstrate a relationship warranting his dismissal for cause.  Thus, the facts elicited by the

4    trial judge do not support a viable challenge for cause or demonstrate that Juror #11 had an actual

5    bias in this case.

6            Petitioner further argues that Juror #11 should have been dismissed because the

7    bias was implied.  Petitioner cites many cases, but primarily relies on the "reasonable

8    apprehension" theory espoused in Allsup.  (Traverse at 18-19.)  In Allsup, two jurors in a bank

9    robbery trial were employees of a different branch of the bank that was robbed.  Id.  On direct

10   appeal, the court held that their relationship to the subject of the trial was too close for them to be

11   impartial, therefore the trial court erred by failing to excuse the jurors for cause.  Id.  Although

12   these two jurors had not been robbed, the court found that their employment with the robbed

13   bank and their "reasonable apprehension of violence" because of the substantial risk of violence

14   from bank robbers created a "substantial probability" that they could not be impartial.  Id. at 71-

15   72.  "Persons who work in banks have good reason to fear bank robbery because violence, or the

16   threat of violence, is a frequent concomitant of the offense."  Id. at 72.

17           Here, however, Juror #11 was a maintenance supervisor, supervising four

18   employees.  This maintenance work consisted of keeping fuel pumps running and changing

19   cables and hoses.  (Pet., Ex. 2 at 108.)  Unlike banks, where many of the employees are within

20   public view and therefore susceptible to bank robberies, robberies at gas stations usually take

21   place at the cashier inside the gas station.  Maintenance workers would not be similarly situated

22   to bank employees at risk of robbery or in peril of substantial emotional involvement in the

23   robberies at issue herein.  In addition, there was no evidence that Juror #11 personally maintained

24   the Exxon Station at issue here; arguably as manager, such duties would be spread out among

25   him and his four employees.  Juror #11 stated he did not work regularly at that Exxon Station.

26   (RT 112, 215.)  The fact that Juror #11 had only had one conversation with Rod Peterson a year

1 ago further supports that statement. "[P]otential bias is extremely attenuated, or non-existent,

2 when the only connection between the victim and the prospective juror is that of employer and

3 employee in a setting in which the employee is working in an area substantially removed from a

4 threat of the crime charged. . . ." Allsup, 566 F.2d at 72, n.1.

5        This court finds that this case does not present the unusual situation where the

6 relationship between Juror #11 and the Exxon Station made it highly likely he could not remain

7 impartial in his deliberations. Rather, Juror #11's connection was attenuated, such that an

8 implied bias cannot be found.

9        Finally, the trial court interviewed Juror #11 on two separate occasions and

10 believed his assertions of continued impartiality to be credible, which the court was entitled to

11 do. First on February 22, 2001, the trial court asked Juror #11 whether his employment would

12 have any effect on his ability to be fair in this case and Juror #11 replied, "no." (RT 112.) Juror

13 #11 denied that his acquaintance-type knowledge of the witnesses would have any affect on his

14 ability to be fair. (RT 113.) Petitioner has presented no evidence to rebut this finding of

15 credibility. A review of the full discourse between the trial court and the juror in question

16 reflects that the juror pronounced himself ready and able to judge this case on the facts before

17 him without regard to his tenuous connection to Exxon.

18        The undersigned agrees with the conclusion of the San Joaquin Superior Court

19 that the record does not suggest juror bias. The state court's rejection of petitioner's first claim

20 for relief was neither contrary to, nor an unreasonable application of, controlling principles of

21 United States Supreme Court precedent. Petitioner's first claim for relief should be denied.

22 /////

23 /////

24 /////

25

26

1        B.  Denial of <u>Faretta</u>[9] Motion

2              Petitioner's third claim is that he was denied his constitutional rights by the trial

3   court's denial of his motion for self-representation under <u>Faretta</u>.  Petitioner contends that the

4   trial court denied his motion because petitioner had "not been to law school."  (Pet. at 6.)

5              The last reasoned rejection of this claim is the decision of the San Joaquin County

6   Superior Court on a petition for writ of habeas corpus.  (Pet., Ex. 8.)  The state court rejected this

7   claim as follows:

8           The record reflects that on November 13, 2000, Petitioner brought
            a <u>Marsden</u> motion to have the public defender removed as counsel.
9           Petitioner asserted at the hearing that he did not believe that she
            was doing all that was necessary on his behalf and he did not like
10          her attitude.  Petitioner wanted a new lawyer and told the court that
            he would not go further with this particular public defender as his
11          attorney.

12          When the judge denied the <u>Marsden</u> motion, Petitioner responded,
            "Well, I go pro per, then, I prefer to go pro per."  RT 23:10-13.
13          The judge then advised the Petitioner, ". . . it would be very unwise
            for you–."  The judge then set Petitioner's <u>Faretta</u> motion to be
14          heard the following day.

15          The <u>Faretta</u> motion was heard in Department 26 on November 14,
            2000.  No transcript of the proceedings is provided.  The trial court
16          denied the motion.

17          Petitioner now asserts that the judge in Department 26 did not give
            him any legal reason for the denial of his motion; the judge simply
18          asked whether he had any legal training and asked whether he
            knew "how much time he was looking at."
19
            A defendant in a criminal case possesses two constitutional rights
20          with respect to representation that are mutually exclusive.  A
            defendant has the right to be represented by counsel at all critical
21          stages of a criminal prosecution.  At the same time, the United
            States Supreme Court has held that because the Sixth Amendment
22          grants to the accused personally the right to present a defense, a
            defendant possesses the right to represent himself or herself. . . .
23          The high court has instructed that courts must draw every inference
            against supposing that the defendant wishes to waive the right to
24          counsel.  It follows . . . that in order to protect the fundamental
            constitutional right to counsel, one of the trial court's tasks when
25

26    _____
         [9]  <u>Faretta v. California</u>, 422 U.S. 806, 812 (1975).

18

confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself." People v. Marshall (1997) 15 C.4th 1, 19-23.

"[T]he high court's emphasis in Faretta on the defendant's knowing, voluntary, unequivocal, and competent invocation of the right suggests that an insincere request or one made under the cloud of emotion may be denied." People v. Marshall @ 21.

In Jackson v. Ylst (9th Cir. 1990) 921 F.2d 882, 888-889, the court stated, "[A criminal defendant's] emotional response when disappointed by the trial court's denial of his motion for substitute counsel did not demonstrate to a reasonable certainty that he in fact wished to represent himself."

Thus, a "court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." People v. Marshall, supra @ 23.

Here, the record shows that Petitioner's Faretta motion was made as a reaction to the trial court's denial of his Marsden motion. Petitioner provides no transcript of the proceedings.

Thus, petitioner has failed to establish a prima facie case for habeas corpus relief as to this ground. In re Bower (1985) 38 C.3d 865, 872.

(Pet., Ex. 8 at 1-2.)

        "A criminal defendant has a right to self-representation at trial, provided that the

defendant is fully informed about the consequences of such action and then knowingly waives

the benefits of legal counsel." Sandoval v. Calderon, 241 F.3d 765, 773-74 (9th Cir. 2000)

(citing Faretta, at 835).

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself

19

1
2
3
> have the skill and experience of a lawyer in order competently and
> intelligently to choose self-representation, he should be made
> aware of the dangers and disadvantages of self-representation, so
> that the record will establish that "he knows what he is doing and
> his choice is made with eyes open."

4   Lopez, at 1117 (citing Faretta, at 835).  The Supreme court clarified the meaning of this rule in

5   Godinez v. Moran, 509 U.S. 389, 399 (1993) when it held "the competence that is required of a

6   defendant seeking to waive his right to counsel is the competence to waive the right, not the

7   competence to represent himself."  Id.; see also VanLynn v. Farmon, 347 F.3d 735 (9th Cir.

8   2003), cert. denied, Mitchell v. Van Lynn, 541 U.S. 1037 (2004).

9                  i.  The Instant Record

10                 On November 13, 2000, a superior court judge heard petitioner's Marsden motion.

11  Petitioner stated he argued all the time with defense counsel and that he didn't see eye to eye

12  with defense counsel on the issues of his case.  (Pet., Ex. 5, at 18.)  Petitioner said he didn't think

13  defense counsel was doing the necessary things; she wasn't filing motions, doing research or

14  doing anything.  (Id.)  When asked whether he could identify something counsel should be doing

15  but wasn't, petitioner responded:

16
17
18
19
20
> I'm not an attorney. . . .That's what she's for.  I'm not an attorney
> but I been doing a little research myself as far as the law library I
> feel it can be more done, you know, with my record.  I know I got
> substantial charges but I feel with my record there should be for
> that can be done.  [¶]  she's telling me I can't even waive time. . . .
> I don't know.  I don't get along with her.  There's no rapport with
> me and her.  I just don't like her attitude at all.  I feel I need a new
> lawyer.

21  (Pet., Ex. 5 at 18.)  The judge stated he was looking for particulars and inquired whether

22  petitioner had any particular witness counsel did not interview.  (Id. at 19.)  Petitioner responded

23  that she wasn't his attorney at that time, and noted she was his third attorney.  (Id.)

24
25
> THE COURT:  So there's nothing in particular you point to just
> because there's been no motions filed and no – you say there's no
> research being done by her and the fact that you don't have a good
> rapport with her?

26  /////

20

1    THE DEFENDANT:  Right.

2    THE COURT:  Anything else that you can think of?

3    THE DEFENDANT:  And I don't like her.  I think.

4    THE COURT: Counsel want to comment at all on no motions, no
     research?

5

6    MS. LUA:  Well, your honor, I did visit [petitioner] at DVI.  I told
     him I would look into whether or not there would be a way to have
     any of his prior[s] stricken.  I've done the research and I've
7    informed him that the way the law currently stands is that he
     cannot bring a collateral motion in superior Court on this matter to
8    strike the strike.  His allegations are basically that his previous
     attorney was incompetent and but for incompetency, he would have
9    never plead to the strikes.  I've researched the area.  My
     understanding is incompetence of counsel cannot be collaterally
10   challenged.  So I cannot bring that specific motion that he's asking
     to bring.

11

12   As for any other motions, I've reviewed the cases and I don't see
     any other motions that are available at this time.  Motions will be
     done, the standard in limines.  And another request to have the
13   motion stricken or have a strike stricken but that's all part of the in
     limine processes before trial.  We're not there yet.

14

15   As to what other things I've done on the case –

16   THE COURT:  Research.  He spoke to motions and research.

17   MS. LUA:  So that's basically the research that I've done and the
     only motion.

18   THE COURT:  Research was mainly as to the priors?

19   MS. LUA:  Right.  As to whether or not there's any motion to try
     to have any of those strikes stricken.

20

21   THE COURT:  Have you interviewed any witnesses?  Are there
     any witnesses that were given to you, names given to you by
     [petitioner]?

22

23   MS. LUA:  No, your honor.  There have been no witnesses given
     to me by [petitioner].  What I have done is I have consulted with
     the mistaken identity expert and I've retained that individual who
24   potentially will testify at trial.  That's the only witness that I have
     but he has not provided me with names of alibi witnesses or any
25   other defense witnesses that could be helpful.

26   /////

THE COURT:  What about the personal aspect of it.  The no rapport, not seeing eye to eye.

MS. LUA:  Well, as far as my discussions, we haven't had any argument.  I think he basically feels that I haven't done enough with the case.  [¶]  But I wasn't aware that he – the last time we were in court he was upset that I wasn't able to get him an offer that was not a life term.  And I think in that regard is where he's upset.  I understand that he's frustrated that I can't do anything to get him off but other than that, I wasn't aware of any conflict in our personalities.

THE COURT:  District attorney hasn't made an offer.  And they're not willing to make an offer.  A letter was submitted to the strike commission of their consideration.  The deputy who has the case has no authority to make an offer.  The strike committee refuses to make an offer.  [¶] And in talking to the pretrial conference judge, he feels that it would be an abuse of his discretion to strike a strike in this case.  And he's not willing to make a determinate sentence offer.  [¶]  Anything that you want to add, Mr. Caviness?

. . .

THE DEFENDANT:  Now as far as the strike letter committee, I don't feel confident with her writing – . . .  I didn't feel confident with her writing a letter to the strike committee in my regard.  I don't feel confident.  I feel they didn't strike my strike.  Maybe there's more reasons to but . . . she hasn't done it.  She hasn't done no research.  She didn't ask me, you know, where was you at this time, you know.  She never asked me did I have any alibis or did I have any witnesses I want to call, what happened.  [¶]  How can she show me they had it if she never asked me?

THE COURT:  Anything you want to add?

MS. LUA:  Well, Your Honor, he was there.  He basically admitted to me that he committed all the robberies.  There's not much he can do if what he tells me – I've asked about witnesses and where he was.  So I don't know about what witnesses he can come up with. . . .

. . .

THE COURT:  I'm sorry that you don't see yourself getting along with her on a personal basis.  [¶]  But I can't see any reason here why I can discharge her.  So the . . . Marsden motion will be denied.

THE DEFENDANT:  Well, I go pro per, then.  I prefer to go pro per.

1        THE COURT:  Now I'm denying the <u>Marsden</u> motion.

2  (Pet., Ex. 5, at 19-23.)  The judge advised petitioner he could raise his request at the readiness

3  conference, then stated "However, I would suggest to you that it would be very unwise for you –"

4  <u>Id.</u> at 23.)  Petitioner interrupted:  "I will not go no further with her regardless of what you just

5  denied.  I'll file another one.  I will not go no further with her as my attorney, whatever.

6  (<u>Id.</u> at 23.)  At defense counsel's request, the judge set petitioner's <u>Faretta</u> motion for hearing the

7  next day.  (CT 154.)

8        On November 14, 2000, a different superior court judge held a <u>Faretta</u> hearing

9  outside the presence of the jury.  (Pet., Ex. 4.)  The following colloquy took place:

10
11        MS. LUA:  Mr. Caviness is present.  He is requesting to represent
          himself on the matter.  The Court sent it over here for a <u>Faretta</u>
          motion.

12        THE COURT:  Mr. Caviness, how much legal training have you
13          had?

14        THE DEFENDANT:  None.

15        THE COURT:  You have heard the old saying somebody who
          represents themself either has an idiot for a lawyer or a fool for a
16          client?

17        THE DEFENDANT:  Sure have.

18        THE COURT:  Why do you want to do this?

19        THE DEFENDANT:  Because, I don't like my attorney.  I think
          there is a conflict here.

20        I had a <u>Marsden</u> motion yesterday and the judge denied it.  I don't
          feel confident going with my attorney.
21

22        THE COURT:  How far along did you get in school?

23        THE DEFENDANT:  The 12th grade.

        . . .
24

25        THE COURT:  What is the maximum sentence you could serve on
          this matter?

26        THE DEFENDANT:  Life imprisonment.

1   THE COURT:  It certainly is.  [¶]  You have had no legal training,
    whatsoever?

2
    THE DEFENDANT:  No.

3
    THE COURT: How do you expect to conduct your case if you had
4   no legal training?

5   THE DEFENDANT:  I don't know, but I just – whatever it will
    take for me to get a new attorney.

6
    THE COURT: At this point, I'll deny the <u>Faretta</u> motion.  [¶]  Mr.
7   Caviness is clearly not qualified to act as his own lawyer in this
    type of a case with the potential penalty involved.

8

9   (Pet., Ex. 4, at 1-3.)

10          Another <u>Marsden</u> hearing took place on February 20, 2001.  (CT 218.)  That

11  <u>Marsden</u> motion was also denied.  (CT 218.)

12          Here, petitioner argues that his request to proceed pro per was not simply a

13  reaction to the trial court's denial of his <u>Marsden</u> motion and that the state court was required to

14  allow him to proceed in propria persona.  However, review of the record in this case reflects that

15  petitioner's request, taken in context, demonstrates his response was made in reaction to the

16  denial of his <u>Marsden</u> motion.  Initially when the judge first announced the denial of the <u>Marsden</u>

17  motion, petitioner responded, "Well, I go pro per, then.  I prefer to go pro per."  (Pet., Ex. 5, at

18  23.)  It appears the judge who heard the <u>Marsden</u> motion also believed this request was a reaction

19  to the <u>Marsden</u> ruling because he did not set the <u>Faretta</u> motion for hearing until prompted by

20  defense counsel.  (Pet., Ex. 5, at 23.)

21          But later, during the <u>Faretta</u> motion the next day, when the judge asked why

22  petitioner wanted to represent himself, petitioner responded:  "Because, I don't like my attorney.

23  I think there is a conflict here.  I had a <u>Marsden</u> motion yesterday and the judge denied it.  I don't

24  feel confident going with my attorney."  (Pet., Ex. 4, at 2.)  Petitioner voluntarily raised the

25  <u>Marsden</u> ruling.

26  /////

24

1    Petitioner's waiver of counsel, to be effective, must be unequivocal. <u>Jackson v.</u>

2   <u>Ylst</u>, 921 F.2d 882, 888 (9th Cir. 1990). In addition, judges are required to draw reasonable

3   inferences against the waiver of the right to counsel. <u>Brewer v. Williams</u>, 430 U.S. 387, 404

4   (1977). Here, the judge cautiously drew reasonable inferences against the waiver of counsel.

5   The above facts are sufficient for a state court to find that petitioner's desire to proceed in pro per

6   was a reaction to the denial of the <u>Marsden</u> motion.

7    In addition, the instant case is distinguishable from <u>Van Lynn v. Farmon</u>, 347 F.3d

8   735 (9th Cir. 2003). In <u>Van Lynn</u>, the court held that denial of a <u>Faretta</u> motion is contrary to

9   clearly established Supreme Court case law if it is based on the trial court's belief that the

10   defendant would be unable to present the case in an informed, reasonable or intelligent manner.

11   <u>Id.</u> at 737, 740-41. In <u>Van Lynn</u>, however, there was no reasoned state court opinion, so the

12   federal court examined the decision of the trial court. In the instant case, under AEDPA, this

13   court is constrained to review the last reasoned opinion of the San Joaquin County Superior

14   Court, which found that petitioner's request to proceed pro per was a reaction to the trial court's

15   denial of the <u>Marsden</u> motion. While it is true that the trial judge also inquired into petitioner's

16   educational background, there were sufficient facts from which the court could find that

17   petitioner's request was a reaction to the denial of his request for new counsel. Petitioner's

18   statements, taken in context, support an inference that petitioner's request to proceed in pro per

19   was equivocal. Accordingly, the state court's denial of this claim was not contrary to, nor an

20   unreasonable determination of clearly established Supreme Court authority. Petitioner's third

21   claim for relief should be denied.

22    C.  Ineffective Assistance of Appellate Counsel

23    Petitioner's second claim is that he was denied the effective assistance of

24   appellate counsel by counsel's failure to raise additional claims on appeal. Specifically,

25   petitioner claims that his appellate counsel rendered ineffective assistance when he failed to raise

26   on direct appeal the issue of juror bias or the denial of petitioner's <u>Faretta</u> motion.

1    The Sixth Amendment guarantees the effective assistance of counsel.  To

2 establish that trial counsel's representation failed to meet Sixth Amendment standards, petitioner

3 must show (1) counsel's performance fell below an objective standard of reasonableness, and (2)

4 prejudice.  Strickland v. Washington, 466 U.S. 668 (1984).  Trial counsel has a duty "to make

5 reasonable investigations or to make a reasonable decision that makes particular investigations

6 unnecessary."  Id. at 691.  There is a strong presumption that counsel's conduct falls within the

7 wide range of reasonable professional assistance, or what "'might be considered sound trial

8 strategy.'"  Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

9    The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

10 v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

11 However, an indigent defendant "does not have a constitutional right to compel appointed

12 counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

13 professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

14 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

15 ability of counsel to present the client's case in accord with counsel's professional evaluation

16 would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

17 Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

18 not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

19 meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

20 showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

21 to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

22 context, petitioner must demonstrate that, but for counsel's errors, he probably would have

23 prevailed on appeal.  Miller, 882 F.2d at 1434, n.9.

24    Petitioner states he informed appellate counsel about the issue of juror bias and

25 the denial of the Faretta motion (Pet. at 28) and that appellate counsel had benefit of the same

26 transcripts petitioner did.  (Pet. at 29.)

1    Petitioner's appellate counsel apparently reviewed the trial transcripts and raised

2   the issue he believed had the most merit.  This decision was "within the range of competence

3   demanded of attorneys in criminal cases."  McMann v. Richardson, 397 U.S. 759, 771 (1970).

4   Although petitioner faults counsel for not raising the claims contained in this petition, this court

5   has evaluated those claims and determined they lack merit.  Accordingly, petitioner is unable to

6   demonstrate prejudice.  After a review of the record, this court concludes that the state court

7   determination with regard to petitioner's claim of ineffective assistance of appellate counsel was

8   not contrary to, or an unreasonable application of Strickland.   Accordingly, petitioner is not

9   entitled to relief on this claim.[10]

10    For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

11   application for a writ of habeas corpus be denied.

12    These findings and recommendations are submitted to the United States District

13   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17   shall be served and filed within ten days after service of the objections.  The parties are advised

18   /////

19   /////

20

21    [10]  In his traverse, petitioner raises, for the first time, an argument that he was denied all
assistance of appellate counsel because appellate counsel only raised one issue and it was

22   frivolous because it is reviewed under the harmless error standard.  (Traverse at 29.)  However,
just because an issue is reviewed for harmless error does not render the issue legally frivolous.

23   Moreover, on July 18, 2002, the California Supreme Court disapproved the use of CALJIC
17.41.1 and forbade trial courts from using it in the future, although the court also found the use

24   of that jury instruction did not infringe upon federal or state constitutional rights and was not
error.  People v. Engelman, 28 Cal.4th 436 (2003).  It was not until 2004 that the United States

25   Court of Appeals for the Ninth Circuit weighed in.  Brewer v. Hall, 378 F.3d 952, 956 (9th Cir.
2004)(no clearly established United States Supreme Court precedent supports a contention that

26   CALJIC 17.41.1 violates a constitutional right).  Appellate counsel's pursuit of this issue in early
2002 was not legally frivolous.

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  May 15, 2007.

UNITED STATES MAGISTRATE JUDGE

/001;cavi2629.157